**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 14 2013, 5:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE MATTER OF D.H., J.H., A.H., N.H., P.H., S.H., D.H, J.H., and D.H.: Children Alleged To Be Children In Need of Services, ) ) ) ) | |
| T.H. (MOTHER), ) ) | |
| Appellant-Respondent, ) ) | |
| vs. ) ) | No. 49A02-1304-JC-334 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, ) ) ) | |
| Appellee-Petitioner. ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable Danielle Gaughan, Magistrate
Cause No. 49D09-1202-JC-7972
Cause No. 49D09-1202-JC-7973
Cause No. 49D09-1202-JC-7974
Cause No. 49D09-1202-JC-7975
Cause No. 49D09-1202-JC-7976

**November 14, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

T.H. (Mother) appeals the juvenile court's determination that her children, D.H., J.H., A.H., N.H., P.H., S.H., D.H., J.H., and D.H. (collectively, the Children), are Children in Need of Services (CHINS). Mother claims the evidence was insufficient to support the CHINS adjudication.

We affirm.

Mother has nine children, the seven youngest of whom where fathered by J.J. (Father).[1] At approximately 3:30 a.m. on December 25, 2011, Office Lance Rector of the Indianapolis Metropolitan Police Department investigated a domestic disturbance involving Mother and Father. When he arrived at the scene, Officer Rector observed that seven or eight of the Children were present. Mother told Officer Rector that she had been staying at a friend's residence because she was afraid of Father and did not want him to know where she was, but that Father had showed up anyway. Mother reported that Father came into the bedroom Mother was in and engaged in a struggle with her, during which he was on top of her and holding her down. Mother's friend stated that she was calling 911, and Father got off

---

[1] Father does not participate in this appeal. The fathers of the two eldest children are unknown.

of Mother and began arguing with Mother's friend. Mother's friend then left, and Father and Mother again engaged in a physical struggle until Mother's friend returned. Mother's friend and Father exchanged words, and Father left. Officer Rector observed a small cut on the back of Mother's hand, which Mother stated she suffered during the altercation. As a result of this incident, Father was charged with four felonies, including residential entry and domestic battery in the presence of a child, as well as five misdemeanors.

Following this incident, the Marion County Department of Child Services (MCDCS) received reports alleging that the Children had been left without a caregiver and that the family had inadequate housing. Based on this information, a CHINS petition was filed and the Children were removed from the parents' care.

MCDCS subsequently referred multiple voluntary services for Mother, but she declined to participate. Additionally, MCDCS had ongoing difficulty staying in contact with Mother and Father due to their failure to provide MCDCS with accurate addresses and contact information. At a hearing on September 17, 2012, Mother gave the court an address, and the juvenile court ordered Mother to allow Family Case Manager (FCM) Monica Ohieku and the Guardian ad Litem to visit the home that afternoon. Mother was not at the address at the scheduled time, and it appeared that the utilities had been shut off. Mother later denied having told the court that she was residing at the home, stating that she had moved out due to mold problems in the home, but was still storing some belongings and receiving mail there. At a hearing on October 3, 2012, Mother informed the juvenile court that she had been approved for a Section 8 apartment, but she refused to disclose the address or the name of the

apartment complex. Mother stated that she had been prevented from obtaining an apartment large enough to house all nine children because FCM Ohieku told her Section 8 case manager that only four children were being returned. FCM Ohieku stated that she had not spoken to anyone from Section 8.

The fact-finding hearing on the CHINS petition was held over four days, on November 7 and December 3, 2012, as well as on February 1 and 25, 2013. On the first day of fact-finding, Mother testified that no domestic violence had occurred between her and Father. She also told the court that she was staying with a friend because she did not currently have her own home. She testified that she had made plans with Jill Moorer, the Children's paternal aunt with whom the Children had been placed, to move into the home in which Moorer and the Children were then residing. According to Mother, she had paid a deposit and the first month's rent on the home with the understanding that Moorer would move out and the parents would move in. Moorer later testified that Mother had provided her with $1,500 to acquire housing for the Children, but that Moorer had not received any additional money from Mother and was paying the rent without help from the parents. Moorer testified further that the possibility of parents moving into the home had been discussed, but that the landlord had not approved the arrangement and Mother was not listed on the lease.

On the second day of fact-finding, Father testified that he had just obtained a three-bedroom apartment through Section 8 housing. Father testified that he did not inform FCM Ohieku that he had obtained the apartment because he "was afraid that she might sabotage"

him." *Transcript* at 234. Although the lease permitted only Father, Mother, and four of the Children to live at the residence, Father claimed that the apartment manager had agreed to allow all nine children to live there.

At the conclusion of the second day of fact-finding, the juvenile court continued the hearing until February 1, 2012. In the interim, the juvenile court granted the parents a temporary, in-home trial visitation with the five youngest children. During this time, MCDCS referred the parents to Midtown Mental Health Center's Homebuilders program, which provides intensive in-home services within a short timeframe. Homebuilder Kymrian Shorts was assigned to the parents' case, but she had difficulty staying in contact with them. Shorts met with the parents eight times in a twenty-eight-day period, during which she would typically meet with a family eighteen to twenty times. Parents missed a number of scheduled appointments and were not available when Shorts made unannounced visits, and as a result, she was unable to assess the appropriateness or safety of the housing arrangements. Additionally, Shorts expressed concerns about Mother's mental health. Nevertheless, MCDCS scheduled a Child and Family Team Meeting to devise a plan to reunite the rest of the children with the parents, but Mother and Father failed to attend, despite the fact that Shorts made them aware of the meeting and its purpose and knew that Homebuilders offered transportation. Homebuilders closed the case as unsuccessful, and the in-home trial visitation was terminated.

On the third day of fact-finding, Officer Rector testified concerning his investigation of the domestic violence incident on December 25, 2011. Additionally, Valarie Calhoun of

the Indianapolis Housing Agency testified that when Father was initially approved for Section 8 housing, he was issued a voucher for a one-bedroom apartment. Calhoun further testified that Father was upgraded to a three-bedroom voucher after someone from MCDCS communicated to the Section 8 case manager that four children would be returned to Father, and that if more children were returned, Father's housing voucher could be upgraded. Calhoun also testified that the Housing Agency had received a letter from Father's apartment complex indicating that Father would not be allowed to house all nine of the Children in his current apartment. On the fourth day of fact-finding, Mother testified that MCDCS had prevented Father from obtaining a larger apartment and that the CHINS case was opened because a MCDCS employee and another woman had conspired against her. Mother again denied that any domestic violence had occurred between her and Father.

On February 25, 2013, following the conclusion of the fact-finding hearing, the juvenile court issued its order adjudicating the Children as CHINS. In support of its CHINS finding, the juvenile court cited the parents' unaddressed domestic violence issues and the need to confirm that they have adequate and stable housing. The juvenile court subsequently conducted a dispositional hearing and issued its dispositional order on March 13, 2012. The permanency plan for the Children remains reunification with the parents. Mother now appeals.

On appeal, Mother argues that the juvenile court's CHINS adjudication is not supported by sufficient evidence. Where, as here, a juvenile court enters findings of fact and conclusions of law in support of its CHINS determination, we apply a two-tiered standard of

review. *Parmeter v. Cass Cnty. DCS*, 878 N.E.2d 444 (Ind. Ct. App. 2007). First, we consider whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* We will not set aside the findings or judgment unless they are clearly erroneous. *Id.* Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* While we defer to the juvenile court's findings of fact, we do not do so to its conclusions of law. *Id.* Additionally, we will not reweigh the evidence; rather, we consider the evidence favorable to the judgment and draw all reasonable inferences in favor of the judgment. *Id.*

In this case, MCDCS alleged that the Children were CHINS pursuant to Ind. Code Ann. § 31-34-1-1 (West, Westlaw current with all 2013 legislation), which provides that a child under eighteen years of age is a CHINS if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>     (A) the child is not receiving; and
>     (B) is unlikely to be provided or accepted without the coercive intervention of the court.

"Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).

7

Here, the juvenile court found that the Children's physical or mental condition was seriously impaired due to the unaddressed domestic violence issues between the parents and the need to confirm that the parents have stable and appropriate housing for all of the Children. Our Supreme Court has acknowledged that a child's exposure to domestic violence can support a CHINS finding. *In re N.E.*, 919 N.E.2d 102; *see also In re S.W.*, 920 N.E.2d 793 (Ind. Ct. App. 2010) (affirming CHINS finding based, in part, on child's statement that domestic violence had been occurring in the household). In this case, Officer Rector testified that when he arrived to investigate the December 25, 2011 domestic disturbance involving Mother and Father, he observed that seven or eight of the Children were present. Mother told Officer Rector that she had been staying at a friend's residence because she was afraid of Father and did not want him to know where she was, but that Father showed up at the residence. Mother told Officer Rector that Father had engaged in a physical altercation with her and her friend, and Officer Rector observed a small cut on the back of Mother's hand. As a result of this incident, Father was charged with four felonies, including residential entry and domestic battery in the presence of a child, as well as five misdemeanors.

Mother argues that this evidence was insufficient to support a CHINS adjudication because, although seven or eight of the Children were present when the incident occurred, there is no testimony that they saw the violence taking place. But the CHINS statutes do not require the juvenile court and MCDCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical

8

or mental condition is endangered. *In re R.P.*, 949 N.E.2d 395 (Ind. Ct. App. 2011). We do not think it necessary for a child to be in the room while domestic violence occurs in order to be endangered by it. In this case, seven or eight of the Children were in the home when Father attacked Mother and her friend and when police arrived to investigate the report. Moreover, Mother told Officer Rector that she had gone to stay at her friend's house because she was afraid of Father and did not want him to know where she was. Under these facts and circumstances, we cannot conclude that the juvenile court's finding that the Children's physical or mental health was seriously endangered due to the parents' failure to provide a safe and appropriate living environment free from domestic violence was clearly erroneous.

Mother also argues that "[b]y the time of the CHINS final hearing, the parents were participating in visitation together, and [MC]DCS's goal was to place all of the children back in the home with both mother and father." *Appellant's Brief* at 13. According to Mother, this evidence establishes that "there was no proof of impairment or endangerment to the children due to domestic violence." *Reply Brief* at 3. Mother's argument in this regard is simply a request to reweigh the evidence. Although the parents had reconciled and were participating in visitation together at the time the juvenile court issued its CHINS finding, this by no means proves that their domestic violence problems have been resolved, particularly in light of the fact that Mother and Father have not participated in domestic violence education or counseling. Likewise, the fact that MCDCS plans to place the Children back with both Mother and Father does not mean that there is no longer a risk that domestic violence will occur.

9

Mother also argues that the juvenile court's finding that the Children's physical or mental health was seriously endangered due to a lack of confirmed stable and appropriate housing was not supported by the evidence. Specifically, Mother argues that "DCS did not present evidence to show that the children's home was inappropriate at the time they were removed." *Appellant's Brief* at 13. But in making a CHINS determination, the juvenile court is not limited to considering the situation at the time the petition was filed. *In re C.S.*, 863 N.E.2d 413 (Ind. Ct. App. 2007), *trans. denied*, *abrogated on other grounds in In re N.E.*, 919 N.E.2d 102. This court has held that the court should also consider the situation at the time of the trial court's CHINS determination. *Id.*

For months after the Children were removed and the CHINS petition was filed, Mother did not provide MCDCS with an address. Finally, at a hearing on September 17, 2012, Mother gave the court an address, and the juvenile court ordered Mother to allow FCM Ohieku and the Guardian ad Litem to visit the home that afternoon. Mother was not at the address at the scheduled time, and it appeared that the utilities had been shut off. Mother later denied having told the court that she was residing at the home. Mother stated that she had moved out due to mold problems in the home, but that she was still storing some belongings and receiving mail there. At a hearing on October 3, 2012, Mother told the juvenile court that she had been approved for a Section 8 apartment, but she refused to disclose the address or the name of the apartment complex.

On the first day of fact-finding, Mother no longer claimed to have an apartment; instead, she stated that she did not currently have a home and was staying with a friend. She

stated that her plan was to take over Moorer's lease on the home where the Children were then residing in relative foster care, but Moorer later testified that while the possibility of the parents moving into the home had been discussed, they were not listed on the lease and the landlord had not approved the plan. On the second day of fact-finding, Father testified that he had obtained a Section 8 apartment, but that he had not informed FCM Ohieku of that fact. A copy of the lease admitted into evidence showed Father and Mother as the lessees and listed four of the Children as occupants, but Father claimed that the apartment manager had agreed to allow all nine Children to live there. Five of the Children were then returned to the parents for a temporary trial home visit, but the parents did not stay in contact with Homebuilders or MCDCS in order to allow them to adequately assess the safety and appropriateness of their housing, and the trial visit was terminated. On the third day of fact-finding, Calhoun testified that the Housing Agency had received a letter from Father's apartment complex indicating that Father would not be allowed to house all nine of the Children in the apartment.[2]

In sum, the evidence presented at trial established a long pattern of housing instability. Moreover, throughout the pendency of the CHINS proceedings, the parents have

---

[2] Mother argues that MCDCS prevented Mother and Father from obtaining adequate housing for all nine of the Children by informing their Section 8 case manager that only four of the Children were being returned to the parents' care. Mother's assertion is not supported by the evidence. Calhoun testified that at some point, MCDCS was in contact with the Housing Agency, although it is unclear which side initiated the contact. Apparently, MCDCS informed the Housing Agency that four of the Children would be returning to the parents' care. Prior to this communication, Father had only been approved for a one-bedroom voucher because none of the Children were in his custody, but based on the information MCDCS provided, he was approved for a three-bedroom voucher. Thus, if anything, MCDCS was responsible for an upgrade in Father's housing voucher.

continuously prevented MCDCS from assessing the safety and appropriateness of their housing. Under these facts and circumstances, we cannot conclude that the juvenile court's finding that the Children's physical or mental health was seriously endangered due to the lack of confirmed stable, safe, and appropriate housing was clearly erroneous.

Finally, Mother argues that the trial court's finding that the Children were in need of care, treatment, or rehabilitation that they were not receiving and were unlikely to receive without the coercive intervention of the court was unsupported by the evidence. In support of its finding in this regard, the juvenile court noted that Mother and Father have been uncooperative and refused to communicate with MCDCS, which has resulted in the Children being removed from their care for a longer period of time than might otherwise be necessary. The court noted further that Mother and Father have gone so far as to refuse to provide MCDCS and the court with their address. Moreover, the parents had no contact with MCDCS between June and October 2012, which made it impossible for MCDCS to arrange visitation with the Children during that time. We note further that Mother disobeyed the juvenile court's order to meet with FCM Ohieku at the address she provided at the September 17, 2012 hearing, she has not participated in the voluntary services referred by MCDCS, and she continues to deny that any domestic violence has occurred between Father and herself. This evidence is more than sufficient to support the juvenile court's finding that the Children are in need of care, treatment, or rehabilitation they are not likely to receive without court intervention. For all of these reasons, we conclude that the juvenile court's CHINS adjudication was not clearly erroneous.

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.