**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 21 2014, 9:00 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF: )
S.G. and M.H. (Minor Children), Children )
Alleged to be Children in Need of Services, )
)
   and )
)
P.G. (Mother), )
)
    Appellant-Respondent, )
)
      vs. ) No. 49A02-1307-JC-612
)
INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
    Appellee-Petitioner. )

**February 21, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-respondent Mother appeals the juvenile court's determination that her two minor children, S.G. and M.H., are Children in Need of Services (CHINS). Mother claims that the evidence was insufficient to support the CHINS adjudication because the adjudication determination was "without evidentiary support." Concluding that Mother's arguments constitute an improper invitation to reweigh the evidence, we find that there was sufficient evidence to support the CHINS adjudication and affirm the judgment of the juvenile court.

<u>FACTS</u>

Mother is twenty-five years old and has three children: S.G., born on May 20, 2007, B.B., born on July, 29, 2008, and M.H., born on April 8, 2011. Mother has stipulated that B.B. is a CHINS, and this appeal concerns only S.G. and M.H. S.G.'s father did not attend the CHINS hearings and stipulated that he was unable to parent. M.H.'s father never appeared at any of the CHINS hearings, although he allegedly lives in Indianapolis.

On December 10, 2012, the Department of Child Services (DCS) received allegations suggesting that Mother was not providing safe living conditions for her children. DCS family case manager Seanna Nichols was assigned to Mother's case and asked to create an assessment report regarding the family. When Nichols ran a child protective index background search on Mother, she discovered that Mother was involved in two previous CHINS situations with the most recent involving medical neglect of BB and that S.G. and M.H. were later added to the report. Nichols testified she believed they were added because Mother was incarcerated. Nichols, to continue her assessment, attempted to speak with the children, but Mother would not allow them to speak with her. Nichols also tried to ask Mother about the allegations the DCS had received, but eventually ended the interview because Mother was uncooperative.

As the assessment moved forward, Nichols recommended the removal of the children due to concerns for their safety. Nichols became concerned because Mother was evasive regarding her living situation. When Nichols would attempt to schedule a time to see Mother's living quarters, Mother would suggest meeting elsewhere and tell her that the children were unavailable. Nichols was worried that Mother did not have a place to live. When Nichols asked Mother where she lived, Mother gave her an address on Grand Avenue, but Nichols was unable to locate Mother there or at two other addresses where she allegedly lived. Eventually, on December 12, 2013, Nichols located Mother at her maternal Grandmother's (Grandmother) home, and Mother admitted that she did not currently have a place to live. Nichols was denied access to Grandmother's home.

Nichols returned to the home the next day, intending to remove the children on an emergency basis. Mother was not present and refused to return to the home or meet Nichols anywhere else. Nichols tried to provide notice of court over the phone, but Grandmother told her that Mother was not there.

On December 14, 2012, the DCS requested permission from the juvenile court to file its petition, and the juvenile court granted permission that same day. The DCS filed its CHINS petition, alleging that Mother: 1) was not providing for B.B.'s medical needs; 2) was currently under investigation for welfare fraud; 3) did not have stable housing; 4) did not have a stable source of income; 5) refused the DCS access to the children; 6) refused to meet with a family case manager to address child safety concerns; 7) had a prior DCS history owing to medical neglect, exposing the children to domestic violence, and having an inappropriate home environment; and 6) continued to demonstrate an inability to provide children with a safe, stable home despite prior services offered.

Also on December 14, 2012, Mother appeared at the initial/detention hearing, where the court appointed her counsel and entered a denial on her behalf. At the hearing, the DCS asked to remove the children from Mother's care, as Mother had refused to cooperate and would not disclose the children's location. The juvenile court gave the DCS authorization to remove the children. On January 8, 2012, the juvenile court held a pre-trial hearing, where Mother was represented by counsel. The juvenile court ordered supervised parenting time, homebased services, and a home visit pending positive recommendations from service providers.

4

On January 22, 2013, Mother appeared at a second pre-trial hearing where the court admonished all parties to return all phone calls, maintained S.G.'s placement in relative care and M.H.'s placement in foster care. On January 29, 2013, the court conducted a third pre-trial hearing, where Mother requested mediation and factfinding dates and requested the return of the children. The juvenile court set mediation and factfinding dates for February 8, 2013 and February 11, 2013. Mother failed to appear for the mediation, but did appear at the February 11, 2013 factfinding hearing, at which the juvenile court sent the matter back to mediation.

On April 1, 2013, the juvenile court held a factfinding hearing, and Mother appeared with counsel. Mother stipulated that B.B. was a CHINS because she was unable to meet B.B.'s special medical needs, and the court adjudicated B.B. a CHINS. At the parties' agreement, the juvenile court held a dispositional hearing regarding B.B., and the court ordered Mother to participate in services.

At the hearing, Patrick Maher, whom the DCS assigned to Mother's case as an ongoing family case manager around December 14, 2012, testified that he had struggled to confirm Mother's source of income or her place of residence. When Maher asked Mother for proof of housing, she at first failed to provide any. Upon further requests from Maher, Mother eventually provided him with a copy of an unsigned lease at a court hearing in December 2012. She signed it in the court waiting area in his presence. Maher later received a second lease from Mother eight to ten days before the factfinding hearing. This lease, received in March, was not the same lease presented to Maher in

5

December. Despite attempts to contact the landlords listed on Mother's respective leases, Maher was never able to make contact with either landlord.

Maher also testified concerning Mother's relationship with S.G. and M.H. He stated that, although Mother was attentive to and bonded with S.G. and M.H. during her visits with them, she missed twelve out of twenty-eight scheduled visits. The last visit Mother cancelled was two weeks prior to the factfinding hearing.

Kristen Cramer, Mother's homebased care manager, also testified at the factfinding hearing. She stated that, on March 8, 2012, she went to Mother's home and found unsatisfactory conditions. She testified that old soda cans and food were strewn about, that the kitchen was dirty and one of the oven burners was lit with no one supervising. Additionally, Cramer testified that two children under the ages of five were standing in an upstairs bedroom clothed only in underwear, that Mother's children's bedroom was cluttered and unfit for their safety, and that an adult female was sleeping in a bed in the third bedroom.

Cramer returned on April 1, 2013, and while she found that her concerns had been addressed, she did not recommend placing the children in the home with Mother as Mother had not provided a lease for the home. Cramer was unable to discover the identities of the other adult and children present during the first walk through. Cramer was concerned that the home would not be stable for S.G. and M.H.

At the factfinding hearing, Mother argued that, as B.B. was adjudicated a CHINS, there was no need for S.G. and M.H to be adjudicated CHINS. She maintained that

6

finding S.G. and M.H to be CHINS would not change the level of DCS intervention in Mother's life, as the services which would be ordered would be the same as those already ordered as a part of B.B.'s CHINS adjudication. However, Cramer and Jackie Carpenter-Conway, a home-based therapist that works with Mother, both testified that, if S.G. and M.H. were not adjudicated CHINS, they would only provide services concerning B.B.'s case. Both Cramer and Carpenter-Conway also stated that they believed Mother needed to continue to engage in services pertaining to S.G. and M.H. Mother testified that she would not engage in any services in the absence of a court order.

After hearing the evidence, the juvenile court asked both parties to present proposed findings of fact and conclusions of law, and on May 17, 2013, the juvenile court issued an order adjudicating S.G. and M.H. as CHINS. DCS placed S.G. and M.H. with Mother under a temporary home trial.

On June 18, 2013, the juvenile court held a dispositional hearing. Mother did not appear but was represented by counsel. Mother made no objection to homebased counseling or meeting the children's medical needs. The next day, the court issued a dispositional order and parental participation order, in which it ordered Mother to engage in homebased counseling, meet children's mental and medical needs, and to attend all of children's medical appointments.

Mother now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

When, as here, a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered standard of review. Parmeter v. Cass Cnty. DCS, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007). We first consider whether the evidence supports the findings and then whether the findings support the judgment. Id. We will not set aside the findings or judgment unless they are clearly erroneous. Id. Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. Id. We give due regard to the juvenile court's ability to assess witness credibility and do not reweigh the evidence. Instead, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. Id. We defer substantially to findings of fact but not to conclusions of law. Id.

### II. Mother's Claims

Mother raises several arguments on appeal concerning the juvenile court's findings, which we rephrase as one issue: whether or not there was sufficient evidence to find that S.G. and M.H. were CHINS. Mother claims that the juvenile court's CHINS finding was "entered prematurely and without evidentiary foundation." Appellant's Br. p. 21.

At the outset, we observe that a CHINS is a civil action; therefore, the State must prove by a preponderance of the evidence that a child is a CHINS under the juvenile code. In re N.E. v. IDCS, 919 N.E.2d 102, 105 (Ind. 2010). The question in a CHINS adjudication is not parental fault, but whether the child needs services. Id. at 103. Our CHINS statutes do not require that a court wait until a tragedy occurs to intervene. In re A.H., 913 N.E.2d 303, 305 (Ind. Ct. App. 2009).

A child is a CHINS if, before the child reaches eighteen years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

We will first address Mother's argument that S.G. and M.H. should not be adjudicated CHINS because it would not increase DCS presence in her life. This argument is without merit. Mother stipulated that her child B.B. was a CHINS, and maintains that, because she engages in CHINS services for B.B., it is unnecessary for S.G. and M.H. to be adjudicated CHINS. However, both Cramer, Mother's family case manager, and Carpenter-Conway, Mother's homebased therapist, testified that services were necessary for S.G. and M.H.; they stated that, if S.G. and M.H. were not adjudicated

CHINS, they would provide services only for B.B. Id. at 30-31, 37, 40-41, 44. Mother seems to believe that a CHINS adjudication is focused on the parent, but she is incorrect, because, as stated above, the CHINS adjudication is focused on the individual child in need of services. In re N.E, 919 N.E.2d at 103.

Moving on to the sufficiency of the evidence, we note that at the hearing, the juvenile court was presented with evidence that Mother refused to cooperate with the DCS or DCS employees who provided her with services. She was unable to provide Maher or Cramer with a signed and legitimate copy of a lease. While Cramer was able to see a place in which Mother was residing, Mother could offer no proof that she lived there. Tr. p. 51, 52, 60-61. When Maher asked her for a copy of her lease, she provided him with two leases for different residences over a period of three months. Id. at 60-62. Maher was unable, despite efforts to call, to contact the landlord of either residence. Id. Additionally, Mother was unable to provide Maher with any proof that she received an income. Id. Mother also testified that, in the absence of a court order, she would not participate in any services for the children. Id. at 21. There was more than sufficient evidence to show that Mother was uncooperative and hostile to the DCS and that, without DCS interference, S.G. and M.H. would not receive the services they need. Thus, we conclude that the evidence was sufficient to support the CHINS adjudication.

The judgment of the juvenile court is affirmed.

NAJAM, J., and CRONE, J., concur.

10